IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

J.F., an individual,

       Plaintiff,

                                  Case No. 3:19cv00076

v.

HOSPITALITY INTERNATIONAL, INC.,
G6 HOSPITALITY, LLC,

       Defendants.

## HOSPITALITY INTERNATIONAL, INC. ANSWER TO PLAINTIFF'S COMPLAINT

COMES NOW, Defendant Hospitality International, Inc. ("HII"), by counsel, and for its Answer to Plaintiff's Complaint, respectfully states as follows:

1.     For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

**ANSWER:  To the extent the allegations in Paragraph 1 relate to HII, HII denies the allegations and calls for strict proof thereof.**

2.     Defendants Hospitality International, Inc., and G6 Hospitality, LLC., know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendants Hospitality International, Inc., and G6 Hospitality, LLC., have instead chosen to ignore

the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

**ANSWER:  To the extent the allegations in Paragraph 2 relate to HII, HII denies the allegations and calls for strict proof thereof.**

3.      This action for damages is brought by the Plaintiff (hereinafter identified by her initials "J.F."), a survivor of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA") and Fla. Stat. § 772.104.

**ANSWER:  The allegations in Paragraph 3 do not call for a response.  To the extent the allegations do call for a response, HII denies the allegations and calls for strict proof thereof.**

4.      In late 2016, J.F. met her trafficker in Virginia over the internet. He had found her on Facebook and began stalking her by repeatedly sending her messages and eventually showing up at her home. Shortly thereafter, J.F. lost her apartment, and her trafficker seized on her vulnerability and offered her a place to stay with her children. In January 2017, he moved J.F. and her family into the Defendants' hotels and required J.F to sexually service paying strangers while enduring brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels as the Defendants profited.

**ANSWER:   HII has insufficient information to admit or deny the allegations in Paragraph 4 and therefore HII denies the allegations and calls for strict proof thereof.**

5.     The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

**ANSWER:  To the extent the allegations in Paragraph 5 relate to HII, HII denies the allegations and calls for strict proof thereof.**

6.     J.F. was advertised on Backpage.com, tortured, and exploited at hotels across the southeast including the Red Carpet Inn® in Charlottesville, Virginia and Motel 6® hotels in Fayetteville, North Carolina and both Fredericksburg and Winchester, Virginia.

**ANSWER:   HII has insufficient information to admit or deny the allegations in Paragraph 6 and therefore HII denies the allegations and calls for strict proof thereof.**

7.     As a direct and proximate result of the Defendants' consistent refusals to prevent human trafficking on their hotel properties, J.F. was sex trafficked, sexually exploited, and victimized repeatedly at Hospitality International and G6 Hospitality brand hotels.

**ANSWER:  To the extent the allegations in Paragraph 7 relate to HII, HII denies the allegations and calls for strict proof thereof.**

8.     The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which J.F. was trafficked for

the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

**ANSWER:  To the extent the allegations in Paragraph 8 relate to HII, HII denies the allegations and calls for strict proof thereof.**


## PARTIES

9.      The Plaintiff, having moved to proceed anonymously[1], and thus herein identified by her initials J.F., was sold for sex throughout Virginia and North Carolina. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14), and she resides in the state of Florida.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 9 and therefore HII denies the allegations and calls for strict proof thereof.**


10.      Defendant Hospitality International, Inc. (hereinafter "Hospitality International") offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is incorporated in the State of Tennessee with its principal place of business located at 1726 Montreal Circle, Suite 110, in Tucker, Georgia.

a.      Red Carpet Inn® hotels are Hospitality International hotels.

a.      As a hotel operator, Hospitality International controls the training and policies for its hotels including the Red Carpet Inn® Charlottesville where J.F. was trafficked.

---

[1] Contemporaneously with the Complaint, Plaintiff J.F. filed, pursuant to a Motion to Permit Plaintiff to Proceed Anonymously as J.F. based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature.  That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

     b.     Defendant Hospitality International maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Hospitality International brand standards and all local, state, and federal laws.[2]

     c.     Through its relationship with the staff at the Red Carpet Inn® where J.F. was trafficked, and through the hotel guest perpetrators who trafficked J.F. at Red Carpet Inn® hotels, Hospitality International knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

     d.     Hospitality International receives a percentage of the gross room revenue generated by the operations of Red Carpet Inn® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was trafficked for the purpose of commercial sex.

     e.     Hospitality International owns, supervises, and/or operates the Red Carpet Inn® Charlottesville located at 405 Premier Circle in Charlottesville, Virginia.

     f.     Hospitality International is subject to the jurisdiction of this Court because it regularly transacts business in Virginia; operates a number of hotels in Virginia, including the Red Carpet Inn® Charlottesville; contracts to supply services in Virginia; caused indivisible injuries to the Plaintiff in Virginia; and profited from an illegal sex trafficking venture at the Red Carpet Inn® Charlottesville in Virginia.

**ANSWER:  In response to the allegations in Paragraph 10, HII admits only that it is incorporated in Tennessee; that its principal place of business is located at 1726 Montreal Circle, Suite 110, in Tucker, Georgia; and that it offers franchising opportunities with the Red Carpet Inn hotel brand.  In response to the second subpart (a), HII admits that the**

---

[2] See Hospitality International, Letter from the President, http://www.hifranchise.com/presidents-letter (last visited Dec. 8, 2019).

**contractual relationship between HII and the independent owners of some Red Carpet Inn hotels, including the Red Carpet Inn located at 405 Premier Circle in Charlottesville, Virginia ("Charlottesville Red Carpet Inn") are governed by franchise agreements that speak for themselves. HII denies the remaining allegations as phrased and calls for strict proof thereof.**

11.     Defendant G6 Hospitality LLC (hereinafter "G6 Hospitality") is one of the largest hotel brands in the world and offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. G6 owns, manages, or operates more than 1,400 economy or budget motels under its Motel 6® brand. G6 Hospitality is a Delaware corporation with its headquarters at 4001 International Parkway, Carrollton, Texas. G6 Hospitality may be served by its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701- 4234.

a.     Motel 6® hotels are G6 Hospitality hotels.

b.     As a hotel operator, G6 Hospitality controls the training and policies for its hotels including the Motel 6® Fredericksburg – North, the Motel 6® Winchester VA, and the Motel 6® Fayetteville NC where J.F. was trafficked.

c.     Defendant G6 Hospitality maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with G6 Hospitality brand standards and all local, state, and federal laws.[3]

d.     Through its relationship with the staff at the Motel 6® hotels where J.F. was trafficked, and through the hotel guest perpetrators who trafficked J.F. at Motel 6® hotels, G6

---

[3] G6 Hospitality International, Inc., Our Impact, https://g6hospitality.com/about-us/our-impact-2/ (last visited Dec. 5, 2019).

Hospitality knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

e.     G6 Hospitality receives a percentage of the gross room revenue generated by the operations of Motel 6® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was trafficked for the purpose of commercial sex.

f.     G6 Hospitality owns, supervises, and/or operates the Motel 6® Fredericksburg – North located at 401 Warrenton Road in Fredericksburg, Virginia, the Motel 6® Winchester VA located at 2951 Valley Avenue in Winchester, Virginia, and the Motel 6® Fayetteville NC located at 2076 Cedar Creek Road in Fayetteville, North Carolina.

g.     G6 Hospitality is subject to the jurisdiction of this Court because it regularly transacts business in Virginia; operates dozens of hotels in Virginia, including the Motel 6® Fredericksburg - North and the Motel 6® Winchester VA; contracts to supply services in Virginia; caused indivisible injuries to the Plaintiff in Virginia; and profited from an illegal sex trafficking venture at the Motel 6® Fredericksburg - North and the Motel 6® Winchester VA in Virginia.

**ANSWER:  The allegations in Paragraph 11 do not relate to HII and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

12.     Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

**ANSWER:  The allegations in Paragraph 12 do not require a response.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

## JURISDICTION AND VENUE

13.     This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

**ANSWER:   The allegations in Paragraph 13 are legal conclusions to which no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

14.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

**ANSWER:   The allegations in Paragraph 14 are legal conclusions to which no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

## SEX TRAFFICKING UNDER FEDERAL LAW

15.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force,

fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

**ANSWER:   The allegations in Paragraph 15 are legal conclusions to which no response is required.   To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

16.     To better understand the mechanism by which sex trafficking is prohibited by the federal criminal law, it is best to address these elements in the reverse. Sex trafficking is slavery for the purpose of commercial sex. It is only a lens on the already existing crime prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act, and the means. The act is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the means is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

**ANSWER:   The allegations in Paragraph 16 are legal conclusions to which no response is required.   To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

17.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

**ANSWER:   The allegations in Paragraph 17 are legal conclusions to which no response is required.   To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

18.     Pursuant to 18 U.S.C. §1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force fraud and coercion are guilty of sex trafficking. This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work and the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[4]

**ANSWER:   The allegations in Paragraph 18 are legal conclusions to which no response is required.   To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*  The Polaris Project[5]

19.     Human trafficking is the world's fastest growing crime.[6] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[7]

---

[4] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law both categories are 'traffickers'.

[5] Recommendations for Hotels and Motels, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[6] Human Trafficking is the World's Fastest Growing Crime, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[7] Profits and Poverty: The Economics of Forced Labor, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 19 and therefore HII denies the allegations and calls for strict proof thereof.**

20.     Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 20 and therefore HII denies the allegations and calls for strict proof thereof.**

21.     The hospitality industry plays a crucial role in the sex trade.[8]   The trope of the "no-tell, motel"  is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

**ANSWER:  To the extent the allegations in Paragraph 21 relate to HII, HII denies the allegations and calls for strict proof thereof.**

22.     According to National Human Trafficking Hotline statistics, hotels are the top reported venue, even over commercial front brothels, where sex trafficking acts occur.[9] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 22 and therefore HII denies the allegations and calls for strict proof thereof.**

---

[8] Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University School of Hotel Administration (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[9] National Human Trafficking Hotline Statistics, THE POLARIS PROJECT (2016), https:// polarisproject.org /resources/2016-hotline statistics.

23.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 23 and therefore HII denies the allegations and calls for strict proof thereof.**

24.     Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.   Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[10]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 24 and therefore HII denies the allegations and calls for strict proof thereof.**

25.     The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[11]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 25 and therefore HII denies the allegations and calls for strict proof thereof.**

---

[10] Giovanna L. C. Cavagnaro, Sex Trafficking: The hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship .sha. cornell. edu/honorstheses/3.
[11] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

26.      Due to the overall complacency of the hospitality industry on addressing the issue, hotels are the venue of choice for sex trafficking.[12]   Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

**ANSWER:  To the extent the allegations in Paragraph 26 relate to HII, HII denies the allegations and calls for strict proof thereof.**

27.      Every day thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify, and thwart sexual exploitation where it is most likely to occur.

**ANSWER:  To the extent the allegations in Paragraph 27 relate to HII, HII denies the allegations and calls for strict proof thereof.**

28.      But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from dangers that were known or should have been known, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality,

---

[12] Hotels Initiative, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

"the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[13]

**ANSWER:  The allegations in Paragraph 28 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

29.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal, not to mention moral, obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[14]

**ANSWER:  The allegations in Paragraph 29 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

30.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of

---

[13] Giavanna L. C. Cavagnaro, Sex trafficking: The Hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http:// scholarship. sha.cornell.edu /honorstheses/3.
[14] DEPARTMENT OF HOMELAND SECURITY, Blue Campaign Toolkit, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

**ANSWER:  The allegations in Paragraph 30 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

31.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[15]

**ANSWER:  The allegations in Paragraph 31 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

32.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been

---

[15] Id. See also, Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

trained.[16]   Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

**ANSWER:  The allegations in Paragraph 32 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

33.    Hospitality companies can and should mandate that all staff working at all hotel properties across their brand complete sex trafficking training.[17]

**ANSWER:  The allegations in Paragraph 33 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

34.    The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

**ANSWER:  To the extent the allegations in Paragraph 34 relate to HII, HII denies the allegations and calls for strict proof thereof.**

---

[16] Giavanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[17] Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

35.     In 2011, Wyndham trained only some of its employees to look for signs of trafficking.[18]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 35 and therefore HII denies the allegations and calls for strict proof thereof.**

36.     In 2012, an anti-trafficking coalition alerted Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[19]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 36 and therefore HII denies the allegations and calls for strict proof thereof.**

37.     Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention.[20]"

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 37 and therefore HII denies the allegations and calls for strict proof thereof.**

---

[18] Katie Lobosco, Super 8 workers trained to spot sex trafficking, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

[19] Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services, CBIS, http://cbisonline.com/us/wp- content /uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

[20] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com /Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

38.     In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[21]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 38 and therefore HII denies the allegations and calls for strict proof thereof.**

39.     In 2015 and 2016 IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (I) risks of modern slavery affecting their organization including IHG hotels, (ii) risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle. IHG represents that its various risk assessment mechanisms have helped them to identify higher risk locations since 2013.[22]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 39 and therefore HII denies the allegations and calls for strict proof thereof.**

40.     Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[23]

---

[21] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash = B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019).

[22] Id.

[23] Human Rights Policy, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 40 and therefore HII denies the allegations and calls for strict proof thereof.**

41.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[24]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[25]

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 41 and therefore HII denies the allegations and calls for strict proof thereof.**

42.     Hospitality companies have both the power and the responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate the crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

**ANSWER:  To the extent the allegations in Paragraph 42 relate to HII, HII denies the allegations and calls for strict proof thereof.**

---

[24] DHS Blue Campaign Five Year Milestone, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[25] Human Trafficking and the Hospitality Industry, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue- campaign/hospitalityindustry (last visited June 19, 2019).

### B.       THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

43.      Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by the franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning only a contract or franchise agreement and still profit from putting heads in beds.

**ANSWER:  To the extent the allegations in Paragraph 43 relate to HII, HII denies the allegations and calls for strict proof thereof.**

44.      The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if  they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

**ANSWER:  To the extent the allegations in Paragraph 44 relate to HII, HII denies the allegations and calls for strict proof thereof.**

45.      In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and website. Thus, booking and room reservations are controlled by the corporate parent brand.[26]

---

[26] Ellen Meyer, The Origins and Growth of Franchising in the Hotel Industry, Lodging Magazine (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/

**ANSWER:  To the extent the allegations in Paragraph 45 relate to HII, HII denies the allegations and calls for strict proof thereof.**

46.     The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

**ANSWER: In response to the allegations in Paragraph 46, HII admits only that its contractual relationship with the current owner of the Charlottesville Red Carpet Inn is governed by a franchise agreement that speaks for itself.  HII has insufficient information to admit or deny the remaining allegations in Paragraph 46 and therefore HII denies the allegations and calls for strict proof thereof.**

47.     Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

**ANSWER:  To the extent the allegations in Paragraph 47 relate to HII, HII denies the allegations and calls for strict proof thereof.**

48.     At the time of the incidents alleged herein:

a.     Defendant Hospitality International, Inc. owned and controlled the Red Carpet Inn® brand.

b.      Defendant G6 Hospitality, LLC owned and controlled the Motel 6® brand.

**ANSWER:  To the extent the allegations in Paragraph 48 relate to HII, HII admits only that, by virtue of a License Agreement with RCI International, Inc., HII licensed to others the ability to operate under the Red Carpet Inn brand at the time of the alleged incidents.  HII denies the remaining allegations and calls for strict proof thereof.**

49.      Parent hotel brands may kick delinquent hotels out of their system but because it is at the expense of terminating their royalty payments it is seldom done.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 49 and therefore HII denies the allegations and calls for strict proof thereof.**

### C.      THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

50.      Defendants Hospitality International, Inc., and G6 Hospitality, LLC., have been on notice of repeated incidences of sex trafficking occurring at their Red Carpet Inn ® and Motel 6® hotels yet these brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

**ANSWER:  To the extent the allegations in Paragraph 50 relate to HII, HII denies the allegations and calls for strict proof thereof.**

51.     HOSPITALITY INTERNATIONAL, INC. ("Hospitality International")

a.      RED CARPET INN®

i.      Defendant Hospitality International owns, supervises, and/or operates the Red Carpet Inn® – Charlottesville located at 405 Premier Circle in Charlottesville, Virginia.

ii.     Hospitality International failed to implement and enforce any of its own policy or policies and protect Plaintiff J.F. from being sex trafficked.

iii.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hospitality International has repeatedly failed to stop these actions.

iv.     Defendant Hospitality International may exercise control over Red Carpet Inn® hotels by:

1.      distributing information to assist employees in identifying human trafficking;

2.      providing a process for escalating human trafficking concerns within the organization;

3.      requiring employees to attend training related to human trafficking;

4.      providing new hire orientation on human rights and corporate responsibility;

5.      providing training and education to Red Carpet Inn® hotels through webinars, seminars, conferences, and online portals;

6.      developing and holding ongoing training sessions on human trafficking; or

7.      providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v.      Hospitality International was in an actual or apparent agency relationship with Red Carpet Inn® hotels offering public lodging services in the hotel. This agency relationship was

Hospitality International's operations, including the means and methods of how Red Carpet Inn® hotels conducted daily business through one or more of the following actions:

1.    hosting online bookings on Defendant Hospitality International's domain;

2.    setting employee wages;

3.    making employment decisions;

4.    advertising for employment;

5.    sharing profits;

6.    standardized training methods for employees;

7.    building and maintaining the facility in a manner specified by the owner;

8.    standardized or strict rules of operation;

9.    regular inspection of the facility and operation by owner;

10.   fixing prices; or

11.   other actions that deprive Red Carpet Inn® hotels of independence in business operations.

vi.    An actual and/or apparent agency also exists between Defendant Hospitality International and Red Carpet Inn® hotels. Defendant Hospitality International held out Red Carpet Inn® hotels to the public as possessing authority to act on its behalf.

vii.    Given Defendant Hospitality International's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Red Carpet Inn® hotels, Defendant Hospitality International breached its duties in the following ways:

1.      Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking; created through Defendant Hospitality International's exercise of an ongoing and systemic right of control over Red Carpet Inn® hotels by Defendant;

2.      Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3.      Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4.      Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5.      Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6.      Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7.      Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii.    For years, Defendant Hospitality International has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Red Carpet Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Red Carpet Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff J.F. at Red Carpet Inn® hotels that forms the basis of this complaint.

1.      In October 2015, Franklin County Municipal Court demanded a Red Carpet Inn® in Columbus, Ohio close for a year. The hotel was declared a nuisance after a number of crimes including a sex trafficking operation were discovered on the property.[27]

2.      In December 2016, a man was indicted for trafficking multiple women at a Red Carpet Inn® in Scranton, Pennsylvania. The man leveraged the women's addictions and controlled them with heroin, cocaine and MDMA.[28]

3.      In July 2013, a nuisance abatement lawsuit was filed by the Harris County Police Department against a Red Carpet Inn® in Sharpstown, Texas because it was a known hub of human trafficking and the commercial sex trade.[29]

**ANSWER:  In response to subpart a(1) of Paragraph 51, HII admits only that the contractual relationship between HII and the independent owner of Charlottesville Red Carpet Inn is governed by a franchise agreement that speaks for itself.  HII denies the remaining allegations of Paragraph 51 and all subparts thereto, and calls for strict proof thereof.**

52.     G6 HOSPITALITY, LLC ("G6 HOSPITALITY")

a.      MOTEL 6®

i.      Defendant G6 owns, supervises, and/or operates the Motel 6® Fredericksburg – North located at 401 Warrenton Road in Fredericksburg, Virginia, the Motel 6® Winchester VA located at 2951 Valley Avenue in Winchester, Virginia, and the Motel 6® Fayetteville NC located at 2076 Cedar Creek Road in Fayetteville, North Carolina.

---

[27] http://www.courtnewsohio.gov/cases/2015/COA/1007/2015-OH-4035.asp#.XHTGAqfMw_W
[28] https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward
[29] https://abc13.com/archive/9165690/

ii.     Defendant failed to implement and enforce any of its own policy or policies and protect Plaintiff J.F. from being sex trafficked.

iii.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant G6 has repeatedly failed to stop these actions.

iv.     Defendant may exercise control over Motel 6® hotels by:

1.     distributing information to assist employees in identifying human trafficking;

2.     providing a process for escalating human trafficking concerns within the organization;

3.     requiring employees to attend training related to human trafficking;

4.     providing new hire orientation on human rights and corporate responsibility;

5.     providing training and education to Motel 6® hotels through webinars, seminars, conferences, and online portals;

6.     developing and holding ongoing training sessions on human trafficking; or

7.     providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v.      Defendant was in an actual or apparent agency relationship with Motel 6® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant's exercise of an ongoing and systemic right of control over Motel 6® hotels by Defendant's operations, including the means and methods of how Motel 6® hotels conducted daily business through one or more of the following actions:

1.     hosting online bookings on Defendant G6's domain;

2.     requiring Motel 6® hotels to use Defendant G6's customer rewards program;

3.     setting employee wages;

4.      making employment decisions;

5.      advertising for employment;

6.      sharing profits;

7.      standardized training methods for employees;

8.      building and maintaining the facility in a manner specified by the owner;

9.      standardized or strict rules of operation;

10.     regular inspection of the facility and operation by owner;

11.     fixing prices; or

12.     other actions that deprive Motel 6® hotels of independence in business operations.

vi.      An actual and/or apparent agency also exists between Defendant G6 and Motel 6® hotels. Defendant G6 held out Motel 6® hotels to the public as possessing authority to act on its behalf.

vii.     Given Defendant's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Motel 6® hotels, Defendant breached its duties in the following ways:

1.      Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2.      Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3.      Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4.      Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5.      Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6.      Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7.      Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii.    More than half the bookings at Motel 6® hotels occur on the same day as arrival. Accordingly, Motel 6® executives have worked to make booking hotel rooms at their properties even easier. As one executive of Motel 6® stated: "Analytics is our North Star. It is how we make decisions, it's how we drive our strategy and it is how we dictate performance." As alleged herein, the Motel 6 brand has been more than willing to use data analytics to increase its profits; yet, it has historically refused to use the same data analytics, or take any reasonable measures, to prevent human trafficking at Motel 6® hotels.[30]

ix.    There are countless examples across place and time of G6 Hospitality's knowledge of sex trafficking at its Motel 6® hotels and its continued, total inattention to preventing and remedying the blight of human trafficking. This illicit, criminal misconduct is so rampant throughout Motel 6® hotels that one online reviewer suggested on a travel website that Motel 6® "Should Be Called Motel Sex."[31]  This entrenched apathy to the real risk of sex trafficking and

---

[30] Allison Schiff, Motel 6: 'Analytics Is Our North Star', AdExchanger (Sept. 7, 2017), https://adexchanger.com/analytics/motel- 6-analytics-north-star/amp/.

[31] Review of Motel 6 Rochester (Aug. 1, 2018), available at https://www.tripadvisor.com/ShowUserReviewsg43466- d242739-r601808847-Motel_6_Rochester-Rochester_Minnesota.html (last visited Feb. 28, 2019) (the reviewer was commenting in August 2018, on a Motel 6 located at 2107 West Frontage Road, Rochester, Minnesota 55901 and added, "Prostitutes, drug dealers, and loud partiers are your neighbors including possibly one or two staff members. Complaints to the clerk do no good. The night clerk does not write it down and the day clerks accuse you of lying although I made it clear that I did not want anything in return for my complaints.")

pervasive willful blindness to the role Motel 6® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff J.F. at Motel 6® hotels that forms the basis of this complaint.

1.      In late 2003, a trafficker set up a sex trafficking venture at a Motel 6® in Connecticut in which two young women were sold for sex 8-10 times per day.[32]

2.      In April 2009, a sex trafficking venture operated out of a Motel 6® in Toledo, Ohio.[33]

3.      In approximately September 2011, sex traffickers set up an operation at a Motel 6® in Toledo, Ohio out of which they sex trafficked 15 and 16- year old girls.[34]

4.      From approximately 2012 through October 2014, two men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6® in Harvey, Illinois.[35]

5.      Police rescued an 18-year old girl from a sex trafficker in February 2012, at a Motel 6® in Portland, Oregon.[36]

6.      The Central Ohio Human Trafficking Task Force completed an investigation which resulted in indictments in August 2012, of several persons charged with human trafficking which occurred at the Motel 6® on Dublin-Granville Road in Columbus, Ohio as well as other locations.[37]

7.      The FBI investigated and arrested several individuals in December 2012, for human trafficking of several young women and a juvenile at a Motel 6® in Madison, Alabama.[38]

---

[32] https://www.vanityfair.com/news/2011/05/human-trafficking-201105
[33] https://abc7chicago.com/archive/7771888/
[34] https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html
[35] https://www.justice.gov/usao-ndil/file/813771/download
[36] https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims
[37] https://www.dispatch.com/content/stories/local/2012/08/03/secret-panel-on-human-trafficking-wins-indictments.html
[38] https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/

8.      The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6® in Anaheim, California.[39]

9.      In approximately March 2013, sex traffickers began selling sex out of Motel 6® operations in Bangor and Portland, Maine.[40]

10.     Beginning in approximately May 2013, a 15-year old runaway was sex trafficked out of the Motel 6® on Caton Avenue in Baltimore, Maryland.[41]

11.     The FBI busted a sex trafficking ring operating out of a Motel 6® in San Antonio, Texas in September 2013.[42]

12.     In Richmond County, Georgia a man was arrested at a local Motel 6® in October 2013, and charged with sex trafficking of two young women.[43]

13.     Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a 17- year old girl for sex out of a Motel 6® in Roseville, Minnesota.[44]

14.     In May 2014, two traffickers were arrested at a Motel 6® in Monterey, California after a 21-year old woman escaped from their captivity.[45]

15.     In the summer of 2014, two girls ages 15 and 16-years old were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6® in Cutler Bay, Florida.[46]

---

[39] https://abc13.com/archive/8909784/
[40] https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/
[41] https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen
[42] https://www.ksat.com/news/sex-trafficking-ring-busted-at-motel-6
[43] https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html
[44] https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/
[45] https://www.ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172
[46] https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html

16.     A Las Vegas man was charged with sex trafficking two victims, including a 17-year old girl, in January 2015, out of a Motel 6® in Rapid City, Nevada.[47]

17.     In February 2015, two men were arrested for sex trafficking a 14-year old girl at a Motel 6® in Seekonk, Rhode Island.[48]

18.     A local law enforcement investigation resulted in the rescue of a 15-year old runaway from a Motel 6® near the Oakland, California airport where she was being sex trafficked.[49]

19.     In North Charleston, South Carolina, a 17-year old girl was rescued in March 2015 from a Motel 6® by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[50]

20.     Two men were arrested in March 2015 for sex trafficking a 15-year old girl at a Motel 6® in Austin, Texas.[51]

21.     In March 2015, police arrested a man for sex trafficking a runaway seventeen 17-year old at a Motel 6® in Warwick, Rhode Island.[52]

22.     Over a 14-month period ending in approximately April 2015, a crime- ridden Motel 6® in Warwick, Rhode Island had 75 arrests on its property for crimes including sex-trafficking.[53]

---

[47] https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-city/21922915/
[48] http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html
[49] https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case
[50] https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153ee- fcb6-5333-9182-926a7f43dfbf.html
[51] https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764
[52] https://www.newportri.com/article/20150324/NEWS/150329666
[53] 53 https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-
guest-list-to-police/?utm_term=.a804ce3f32a8

23.     Seven people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6®.[54]

24.     In the summer of 2015, a woman was arrested at a Motel 6® in Great Falls, Montana where she was involved in sex trafficking a 17-year old girl.[55]

25.     A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages 17, 16, and 15-years old out of a Motel 6® in Everett, Washington.[56]

26.     In Tuscaloosa, Alabama police rescued a 14-year old girl from a Motel 6® in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[57]

27.     In July 2015, sex traffickers sold a 15-year old girl for sex at a Motel 6 in Pismo Beach, California.[58]

28.     In November 2015 a man was arrested at a Motel 6® in Ventura, California and was criminally charged with sex trafficking a 15-year old girl who was found with him.[59]

29.     A federal court sentenced a man to 10-years in prison in November 2016, for sex trafficking a 15-year old girl in 2014 out of a Motel 6® in Hartford County, Connecticut.[60]

30.     In January 2016, a man who operated out of a Motel 6® in Frederick City, Maryland was charged with sex trafficking.[61]

---

[54] https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/
[55] https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/
[56] https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/
[57] https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/
[58] https://www.sanluisobispo.com/news/local/article75832962.html
[59] https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping- human-trafficking-in-ventura-county/88714698/
[60] https://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114-story.html
[61] h https://kfdm.com/news/local/women-accuse-defendant-ofhttps://baltimore.cbslocal.com/2016/01/16/frederick-police-arrest-man-on-human-trafficking-charges/

31.     Criminal charges were brought against a man who sex trafficked a 15- year old girl out of a Motel 6® in Beaumont, Texas in March 2016.[62]

32.     On March 23, 2016, a victim of a sex trafficking ring died at a Motel 6® in Winchester, West Virginia.[63]

33.     The leader of a sophisticated and organized sex trafficking ring beat and raped one of his victims in April 2016, at a Motel 6® in Tinicum Township, Pennsylvania.[64]

34.     Local law enforcement rescued a 17-year old runaway in December 2016, who was being sex trafficked from a Motel 6® in Gibbstown, New Jersey.[65]

35.     In February 2017, the leader of a child sex trafficking ring in Tulsa, Oklahoma, was busted at a local Motel 6® where federal authorities rescued a 16-year old survivor of sex trafficking.

36.     A 45-year old man was charged with human trafficking after picking up a teenage boy from school and taking him to a Motel 6® in Cedar Park, Texas in approximately March 2017.[66]

37.     At a Motel 6® in Des Moines, Iowa a man sex trafficked a minor victim in June 2017.[67]

38.     In approximately June 2017, a 17-year old runaway was rescued by law enforcement from a Motel 6® in Las Vegas, Nevada out of which a sex trafficker was operating.[68]

---

[62] https://kfdm.com/news/local/women-accuse-defendant-of
[63] https://www.localdvm.com/news/virginia/martinsburg-man-convicted-on-sex-trafficking-drug-charges/1708490814
[64] https://patch.com/pennsylvania/phoenixville/man-behind-human-trafficking-ring-chester-county-sentenced
[65] https://www.nj.com/gloucester-county/index.ssf/2017/09/post_139.html
[66] https://www.khou.com/article/news/local/texas/little-elm-man-accused-of-trafficking-austin-teen/285-476893013
[67] https://www.desmoinesregister.com/story/news/crime-and-courts/2018/06/11/7-des-moines-residents-charged-sex-trafficking- feds-des-moines-sexual-prostitution-iowa-texas/692264002/
[68] https://www.reviewjournal.com/crime/sex-crimes/woman-accused-of-sex-trafficking-runaway-on-las-vegas-strip/

39.     A 17-year old girl was sold for sex by traffickers at a Motel 6 in Portland, Oregon in June 2017.[69]

40.     In August 2017, two men operated out of a Motel 6® in Springfield, Virginia to sex traffic a 16-year old girl.[70]

41.     The City of Los Angeles settled a nuisance suit with G6 Hospitality, which operates Motel 6® hotels, in August 2017, for $250,000.00 in an effort to combat human trafficking at Motel 6® brand hotels.[71]

42.     In October 2017, the County Attorney's Office for Harris County, Texas sued a local Motel 6 after law enforcement identified the property as a criminal hotspot that had been attracting drug activity, human trafficking, and violent crime for years. The suit alleged the Motel 6 knowingly tolerated and failed to make reasonable efforts to abate the criminal activities on its property.[72]  Two men were arrested in December 2017, for sex trafficking a minor female out of a Motel 6® in Destin, Florida.

43.     In February 2018, a man engaged in sex trafficking of two women at a Motel 6® near New Orleans, Louisiana.[73]

44.     The Columbus City Attorney's Office issued ultimatums in February 2018, to several area hotels to clean up or shut down, including but not limited to, the Motel 6® at 7480 North High Street near Worthington which, according to police had been the site of significant criminal activity.[74]

---

[69] http://mailtribune.com/news/crime-courts-emergencies/accused-human-traffickers-stopped-in-medford
[70] https://patch.com/virginia/burke/16-year-old-forced-be-prostitute-springfield-motel-report
[71] https://apnews.com/d13636fec55c42b88a08af18db6196fb
[72] https://www.chron.com/neighborhood/spring/news/article/Harris-County-sues-Spring-area-motel-labeled-12293254.php
[73] https://www.nola.com/crime/2018/10/man-accused-of-trafficking-took-females-to-new-orleans-to-make-some-money-for- mardi-gras-warrant.html
[74] https://www.10tv.com/article/columbus-cracks-down-businesses-high-crime-rates

45.     Law enforcement responded to a 911 call from a 17-year old girl who was calling from the lobby of a Motel 6® in Claremont, California in February 2018. Upon arrival, officers discovered that the 17-year old caller and a 15-year old girl were both being sex trafficked at the hotel.[75]

46.     In March 2018, police found a 10-year old girl wearing a dog collar with a 23-year old man who had raped her at a Motel 6® in Lakeland, Florida.[76]

47.     In Richfield, Minnesota a man was criminally charged in June 2018, for sex trafficking a 15-year old girl out of an area Motel 6®.[77]

48.     Police busted a human trafficking operation at a Motel 6® in Ann-Arbor, Michigan in July 2018.[78]

49.     A Motel 6® in Braintree, Massachusetts surrendered its operating license in September 2018, after significant criminal activity, including sex trafficking, was documented occurring on its property.[79]

50.     Not until September 2018 did G6 Hospitality LLC, the parent company of Motel 6®, announce that "the company will introduce anti-human trafficking training to corporate, field and property team members...Additionally, the company developed its own training for all property team members to understand how to effectively intervene and identify potential trafficking situations to protect each other, guests and the community."

51.     Even after this announcement, sex trafficking at Motel 6 properties continued.

---

[75] https://webbcanyonchronicle.com/2953/features/social-media-sexual-assault/
[76] https://www.miamiherald.com/news/local/community/miami-dade/west-miami-dade/article207303799.html
[77] https://kstp.com/news/man-charged-sex-trafficking-richfield-hotel/4955796/
[78] https://www.mlive.com/news/ann-arbor/2018/12/man-charged-with-human-trafficking-at-ann-arbor-area-hotel.html
[79] https://patch.com/massachusetts/braintree/motel-6-ends-fight-reopen-braintree-location

52.     In November 2018, federal authorities arrested a man for sex trafficking a woman out of a Motel 6® in San Jose, California.[80]

53.     In December 2018, a husband and wife were arrested for sex trafficking women who were Chinese nationals out of a Motel 6® in Portsmouth, New Hampshire from approximately 2016 through 2017.[81]

54.     A 14-year old girl was held against her will at a Motel 6®in Raleigh, North Carolina and sex trafficked in or around January 2019.[82]

**ANSWER:  The allegations in Paragraph 52 and the subparts thereto do not relate to HII and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

### D.     THE SEX TRAFFICKING OF J.F.

53.     The facts alleged herein stem from a human trafficking and prostitution ring operated throughout the southeast, including Virginia and North Carolina. While victimized by her trafficker J.F. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels from 2017 - 2018.

**ANSWER:  To the extent the allegations in Paragraph 53 relate to HII, HII denies the allegations and calls for strict proof thereof.**

---

[80] https://www.sanjoseinside.com/2018/11/09/alleged-pimp-arrested-in-san-jose-for-sex-trafficking-young-woman-he-found-on- instagram/
[81] https://www.fosters.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme
[82] https://www.wral.com/third-man-arrested-in-raleigh-alleged-child-trafficking/18104963/

54.     In 2016, J.F.'s trafficker found her on Facebook and began stalking her through messages and in person visits. J.F. noticed him following her at the grocery store, and eventually he appeared at her home. After an altercation between her trafficker and her ex-boyfriend, her ex-boyfriend was arrested.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 54 and therefore denies same and calls for strict proof thereof.**

55.     When J.F. lost her apartment, her trafficker moved her and her children into various hotels. In January 2017, he began trafficking J.F. for the purposes of commercial sex. If J.F. refused, her trafficker would become violent, frequently in front of her children. J.F. lived in perpetual fear of her trafficker's violence and manic temper, complying to survive because she felt she had no choice.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 55 and therefore denies same and calls for strict proof thereof.**

56.     Between 2017 and 2018, J.F.'s traffickers routinely harbored her at hotels throughout the southeast, including the Red Carpet Inn® Charlottesville at 405 Premier Circle, Motel 6® Fredericksburg – North located at 401 Warrenton Road in Fredericksburg, Virginia, the Motel 6® Winchester VA located at 2951 Valley Avenue in Winchester, Virginia, and the Motel 6® Fayetteville NC located at 2076 Cedar Creek Road, in Fayetteville, North Carolina. J.F. would sometimes be held in the rooms for weeks at a time servicing a constant stream of incoming buyers.

**ANSWER:  In response to the allegations in Paragraph 56, HII denies that Plaintiff was harbored against her will at the Red Carpet Inn in Charlottesville at 405 Premier Circle.**

**HII has insufficient information to either admit or deny the remaining allegations in Paragraph 56 and therefore denies same and calls for strict proof thereof.**

57.     J.F.'s trafficker stayed at these hotels over a long period of time, always renting the room for a number of weeks, paying in smaller increments, refusing housekeeping services, and requesting an inordinate amount of towels. For weeks J.F. was held up in the room, unable to leave and visibly deteriorating. Then they would leave, and the same would happen at another of the hotels.

**ANSWER:  To the extent the allegations in Paragraph 57 relate to HII, HII denies the allegations and calls for strict proof thereof.**

58.     J.F. spent three weeks in a Fairfax hospital because her trafficker purposefully crashed the car in an effort to injure her. She suffered multiple fractured vertebrae. J.F. was unable to wear the brace necessary to her recovery because her trafficker forced her to continue to sexually service clients as a result she walked in a manner that showed she was in constant pain.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 58 and therefore denies same and calls for strict proof thereof.**

59.     From 2017-2018, J.F. was required by her trafficker to have sex for payment with various buyers at the Defendants' hotels in response to advertisement for commercial sex that he had posted on Backpage.com under numerous names and without her consent.[83]     There was

---

[83] Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. See Backpage.com's Knowing Facilitation of Online Sex Trafficking, Staff

constant foot traffic from the handfuls of buyers J.F. had to service throughout the day, and each

would enter and exit through the front door of the Defendants' hotels.

**ANSWER:  To the extent the allegations in Paragraph 59 relate to HII, HII denies
the allegations and calls for strict proof thereof.**


60.      J.F. was kept at the Red Carpet Inn in Charlottesville, Virginia for four months. A

hotel employee simply expressed to J.F. that she knew that "a lot of girls get prostituted." J.F.'s

trafficker paid for the room in cash and would keep extending their stay by paying for one night at

a time.

**ANSWER:  HII denies the allegations in Paragraph 60.**


61.      J.F. was prohibited from speaking with any hotels staff, kept her head down and

struggled to make eye contact. She also was checked into each of the Defendant's hotel for an

extended stay but with little to no baggage or persona [sic] belongings.

**ANSWER:  HII denies the allegations in Paragraph 61.**


62.      J.F. and her trafficker stayed at each of the Defendants' hotels for a minimum of

two (2) weeks.

**ANSWER:  To the extent the allegations in Paragraph 62 relate to HII, HII denies
the allegations and calls for strict proof thereof.**

---

Report, Permanent Subcommittee on Investigations, United States Senate (2018), https://www.hsgac.senate.
gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf

63.     J.F.'s trafficker frequently forced her to change her hair color. He once drugged her with Benadryl, and forced her to get a tattoo on her face with the word "rotten." As a result of all that J.F. endured from her trafficker she constantly appeared withdrawn and fatigued, and her appearance was noticeably unkempt as she was dressed inappropriately for travel and exhibited poor hygiene.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 63 and therefore denies same and calls for strict proof thereof.**

64.     J.F. was never allowed to touch the money from the calls her trafficker orchestrated. If her children were around for a call, the trafficker would take them elsewhere. If her children were not around, he would hide in the bathroom until the call was finished.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 64 and therefore denies same and calls for strict proof thereof.**

65.     J.F.'s trafficker caused her to lose her children. Once, in the middle of the night, he drove J.F. and her children to Centerville [sic], Virginia and forced her to leave them with her ex-boyfriend.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 65 and therefore denies same and calls for strict proof thereof.**

66.     J.F.'s trafficker sold her jewelry and car, and responded to any of her protests with brutal violence. The violent episode were frequent and loud enough for hotel staff and patrons to hear. J.F. exhibited obvious injuries including prominent bruising.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 66 and therefore denies same and calls for strict proof thereof.**

67.     Escape was eventually possible for J.F. when her trafficker was arrested. In February 2018, J.F. escaped to a shelter, and then moved in with a friend.

**ANSWER:  HII has insufficient information to admit or deny the allegations in Paragraph 67 and therefore denies same and calls for strict proof thereof.**

68.     Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

**ANSWER:  To the extent the allegations in Paragraph 68 relate to HII, HII denies the allegations and calls for strict proof thereof.**

69.     Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of J.F.

**ANSWER:  To the extent the allegations in Paragraph 69 relate to HII, HII denies the allegations and calls for strict proof thereof.**

**E.     THE DEFENDANTS FACILITATED THE TRAFFICKING OF J.F.**

42

70.     Defendants Hospitality International and G6 Hospitality profited from the sex trafficking of J.F. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to J.F.'s trafficker for weeks at a time, when they knew, or should have known, that he was using their room to imprison J.F., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

**ANSWER:  To the extent the allegations in Paragraph 70 relate to HII, HII denies the allegations and calls for strict proof thereof.**

71.     Defendants Hospitality International and G6 Hospitality knew, or should have known, that J.F. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because J.F.'s trafficker frequented the Defendants' hotels.

**ANSWER:  To the extent the allegations in Paragraph 71 relate to HII, HII denies the allegations and calls for strict proof thereof.**

72.     Defendants Hospitality International and G6 Hospitality knew, or should have known, that J.F. was being trafficked because J.F.'s trafficker paid for his room using cash, reserved his room for an extended stay, refused all housekeeping services but frequently requested towels, constantly entertained traffic from multiple male visitors a day, and checked in with a young woman who seldom left the room; behavior that indicated he was using the Defendants' hotels for his illegal sex trafficking venture.

**ANSWER:  To the extent the allegations in Paragraph 72 relate to HII, HII denies the allegations and calls for strict proof thereof.**

73.     Defendants Hospitality International and G6 Hospitality actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.F.'s trafficker in which to harbor J.F. while he was trafficking her.

**ANSWER:  To the extent the allegations in Paragraph 73 relate to HII, HII denies the allegations and calls for strict proof thereof.**

74.     Defendants Hospitality International and G6 Hospitality profited from the sex trafficking of J.F. and knowingly or negligently aided and participated with J.F.'s trafficker in his criminal venture. The Defendants took no action as J.F. repeatedly visited the hotel, often visiting the same guests, without any luggage, avoiding all eye contact, and exhibiting signs of diminished personal hygiene, sleep deprivation, malnourishment, and often displaying prominent bruising all over her person.

**ANSWER:  To the extent the allegations in Paragraph 74 relate to HII, HII denies the allegations and calls for strict proof thereof.**

75.     Defendants Hospitality International and G6 Hospitality actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from J.F. in which to harbor J.F. while she was being trafficked.

**ANSWER:  To the extent the allegations in Paragraph 75 relate to HII, HII denies the allegations and calls for strict proof thereof.**

76.     The Defendants all had the opportunity to stop J.F.'s trafficker and offenders like him from victimizing J.F. and others like her.  Instead,  every Defendant failed to take reasonable measures to  stop sex trafficking from occurring in their hotels.

**ANSWER:  To the extent the allegations in Paragraph 76 relate to HII, HII denies the allegations and calls for strict proof thereof.**

77.     The Defendants all financially benefited from the sex trafficking of J.F., and other victims  like  her,  and  developed  and  maintained  business  models  that  attract  and  foster  the commercial sex market for traffickers and buyers alike.

**ANSWER:  To the extent the allegations in Paragraph 77 relate to HII, HII denies the allegations and calls for strict proof thereof.**

78.     Defendants Hospitality International and G6 Hospitality enjoy the steady stream of income that sex traffickers bring to their budget level  hotel  brands,  such as  the  Red Carpet Inn® and Motel  6®.

**ANSWER:  To the extent the allegations in Paragraph 78 relate to HII, HII denies the allegations and calls for strict proof thereof.**

79.     Defendants Hospitality International and G6 financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

**ANSWER:  To the extent the allegations in Paragraph 79 relate to HII, HII denies the allegations and calls for strict proof thereof.**

80.     The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

**ANSWER:  To the extent the allegations in Paragraph 80 relate to HII, HII denies the allegations and calls for strict proof thereof.**

81.     The Defendants maintained their deficiencies to maximize profits by:

a.      Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b.      Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

c.      Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

**ANSWER:  To the extent the allegations in Paragraph 81 relate to HII, HII denies the allegations and calls for strict proof thereof.**

82.     As a direct and proximate result of these egregious practices on the part of the Defendants, J.F. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**ANSWER:  To the extent the allegations in Paragraph 82 relate to HII, HII denies the allegations and calls for strict proof thereof.**

## CAUSES OF ACTION

### A.        COUNT ONE – 18 U.S.C §1595 ("TVPRA")

83.        The Plaintiff J.F. incorporates each foregoing allegation.

**ANSWER:  HII incorporates its answers to the foregoing paragraphs.**

84.        J.F. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

**ANSWER:  The allegations in Paragraph 84 call for legal conclusions to which no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

85.        The Defendants acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times the Defendants breached this duty by participating in, and facilitating, the harboring and providing of J.F. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and/or commissions.

**ANSWER:  The allegations in Paragraph 85 call for legal conclusions to which no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

86.     The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of J.F. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the producing, but for, and proximate cause of J.F.'s injuries and damages.

**ANSWER:  To the extent the allegations in Paragraph 86 relate to HII, HII denies the allegations and calls for strict proof thereof.**

87.     J.F. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

**ANSWER:  To the extent the allegations in Paragraph 87 relate to HII, HII denies the allegations and calls for strict proof thereof.**

### B.      COUNT TWO – NEGLIGENCE

88.     The Plaintiff J.F. incorporates each foregoing allegation.

**ANSWER:  HII incorporates its answers to the foregoing paragraphs.**

89.     The Defendants, and their actual and/or apparent agents, servants and/or employees, owed to J.F. a duty to use reasonable and ordinary care to provide for safety in light of

the peculiar risk of sex trafficking at hotels, and to protect J.F. from injury caused by an unreasonable risk of danger in their hotel and/or on their property.

**ANSWER:  The allegations in Paragraph 89 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

90.     Upon information and belief, prior to and during the incidents alleged herein, as outlined above, the Defendants had actual and/or constructive notice of a dangerous condition in their hotels and on their properties, including but not limited to human trafficking.

**ANSWER:  To the extent the allegations in Paragraph 90 relate to HII, HII denies the allegations and calls for strict proof thereof.**

91.     In addition to the Defendants' actual and /or constructive notice, the Defendants' negligent acts, omissions, and/or commissions created a dangerous condition at their hotel and on their property, to wit, a hotel and property with inadequate security that fostered an environment which encouraged human trafficking and sexual exploitation.

**ANSWER:  To the extent the allegations in Paragraph 91 relate to HII, HII denies the allegations and calls for strict proof thereof.**

92.     In addition to the Defendants' actual and /or constructive notice, the Defendants' negligent acts, omissions, and/or commissions failed to address the peculiar risk of sex trafficking in hotels, to wit, a hotel environment which encouraged human trafficking and sexual exploitation.

49

**ANSWER:  To the extent the allegations in Paragraph 92 relate to HII, HII denies the allegations and calls for strict proof thereof.**

93.     The Defendants breached this duty of care by acts, omissions, and commissions including, but not limited to:

a.     Failure to properly monitor surveillance cameras in the hotel and/or on the property for criminal activity and/or signs of human trafficking and/or sexual exploitation in the hotel and/or on the property;

b.     Failure to properly monitor the number of guests in the rooms of the hotel and/or on the property;

c.     Failure to provide adequate security in the hotel and/or on the property with the knowledge that said premises had a history of criminal activity;

d.     Failure to properly monitor the hotel and/or property for signs of dangerous conditions, including, but not limited to, human trafficking, false imprisonment, rape, kidnapping, and sexual exploitation, by ignoring the following conditions:

i.     The repeated refusal of maid service;

ii.     The repeated, almost exclusive, use of side or rear exits for ingress and egress.

iii.     The number and frequency of visitors entering and exiting the Hotel and/or property;

iv.     The number of guests present in any particular room as compared to the rooms capacity;

v.     Signs of the repeated verbal abuse, physical abuse, restraint and/or confinement of an individual by another;

vi.      Signs of control over an individual and/or an individual's personal property by another, including, but not limited to, identification documents;

vii.     Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire;

viii.    The repeated renting of specific rooms in their hotels.

e.       Failure to properly monitor and investigate the hotel and property for signs of suspicious behavior on the premises. Behavior, which would have alerted the Defendants to the sex trafficking of J.F. or at least other criminal activity to which the Plaintiff was a victim. Behavior including, but not limited to, sounds of distress coming from rooms and areas in the hotel, non-guests entering and exiting rooms in the hotel, the repeated renting of specific rooms in the hotel, and the apparent purchasing of sex acts in the hotel.

f.       Failure to properly advise law enforcement of suspicious behavior on the premises which would have alerted the Defendants to the sex trafficking of J.F. or the other criminal activity to which she was a victim. Behavior, including, but not limited to sounds of distress coming from rooms and areas in the hotel, non-guests entering and exiting rooms in the hotel and/or property, the repeated renting of specific rooms in the hotel, and the apparent purchasing of sex acts in the hotel.

g.       Failure to adequately respond to, and investigate, guest complaints regarding suspicious behavior at the hotel and/or on the property, which would have resulted in the discovery of the sex trafficking of J.F. or the other criminal activity to which she was a victim;

h.       Failure to adequately respond to and investigate each of the above articulated issues, which would have stopped the ongoing victimization J.F.; and

i.       Being otherwise careless and negligent.

51

**ANSWER:  To the extent the allegations in Paragraph 93 relate to HII, HII denies the allegations and all subparts thereto and calls for strict proof thereof.**

94.     As a direct and proximate result of the aforementioned negligent acts, omissions, and/or commissions by the Defendants, J.F. was kidnapped, repeatedly and consistently assaulted both physically and sexually, verbally abused, held against her will, regularly exploited, and was otherwise irreparably injured, both physically and psychologically. Said acts were repeatedly perpetrated at the Defendants' hotels and the Defendants had actual or constructive knowledge that these acts, as well as other similar criminal acts, were taking place, and that a peculiar risk resided in their enterprise, and the Defendants had sufficient time to address it and were in the best position to do so. The imminent harm described above, as well as J.F.'s injuries, were a foreseeable and preventable result of the Defendants' negligence.

**ANSWER:  To the extent the allegations in Paragraph 94 relate to HII, HII denies the allegations and calls for strict proof thereof.**

95.     J.F. has suffered, and/or will continue to suffer, from injuries, including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss, past, present and future, as a direct and proximate result of the Defendants', and/or their actual and/or apparent agents, servants, and/or employees', negligent acts, omissions, and/or commissions. By ignoring indicia of criminal activity, the Defendants facilitated such an environment of disorder and violence that the injuries sustained by J.F. were both foreseeable and imminent.

**ANSWER:  To the extent the allegations in Paragraph 95 relate to HII, HII denies the allegations and calls for strict proof thereof.**

96.     Additionally, J.F. has suffered, and continues to suffer, from damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and/or medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendants', and/or their actual and/or apparent agents, servants, and/or employees', negligent acts, omissions, and/or commissions.

**ANSWER:  To the extent the allegations in Paragraph 96 relate to HII, HII denies the allegations and calls for strict proof thereof.**

97.     Furthermore, J.F. has suffered, and continues to suffer, from injuries, including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectations.

**ANSWER:  HII denies the allegations in Paragraph 97.**

98.     The Plaintiff avers that all damages, past, present, and future, were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendants and/or their actual and/or apparent agents, servants, and/or employees', without any negligence or want of due care on the part of the plaintiff contributing thereto.

**ANSWER:  To the extent the allegations in Paragraph 98 relate to HII, HII denies the allegations and calls for strict proof thereof.**

99.     The Plaintiff J.F. incorporates each foregoing allegations.

**ANSWER:  HII incorporates its answers to the foregoing paragraphs.**

100.    The Defendants had a duty to use reasonable care to select, train, supervise, and retain its employees working at its hotels, including but not limited to, proper training and or supervision relating to the observation, investigation, and reporting of signs of human trafficking and sexual exploitation in or about hotels.

**ANSWER:  The allegations in Paragraph 100 call for expert opinion and therefore no response is required.  To the extent a response is required, HII denies the allegations and calls for strict proof thereof.**

101.    At the time of the incidents alleged herein, the Defendants employed staff to operate their hotels and properties, including, but not limited to, front desk clerks, night auditors, housekeeping staff, and/or maintenance workers. Throughout this time period, as outlined above, the Defendants and/or their actual and/or apparent agents, servants, and/or employees', repeatedly failed to observe and report signs of human trafficking and or sexual exploitation taking place at the Defendants' hotels. Furthermore, upon information and belief, the Defendants, and/or their actual and/or apparent agents, servants, and/or employees', repeatedly failed to address this peculiar risk at all.

**ANSWER:  To the extent the allegations in Paragraph 101 relate to HII, HII denies the allegations and calls for strict proof thereof.**

102.    Additionally, prior to the incidents alleged herein, the Defendants failed to properly train their employees regarding security and the detection of criminal activity in their hotels and on their properties, including, but not limited to, signs of human trafficking and sexual exploitation.

**ANSWER:  To the extent the allegations in Paragraph 102 relate to HII, HII denies the allegations and calls for strict proof thereof.**

103.    The Defendants breached this duty of care by acts, omissions, and commissions including, but not limited to:

j.      Failure to adequately train, supervise, and retain employees to ensure proper monitoring of surveillance cameras at their hotels and properties for signs of human trafficking and/or sexual exploitation.

k.      Failure to adequately train, supervise, and retain employees to ensure proper monitoring of the number of guests in each room of their hotels, and non-guest visitors in their hotels.

l.      Failure to provide and/or train adequate security in their hotels with the knowledge that said premises had a history of criminal activity;

m.     Failure to adequately train, supervise, and retain employees, to ensure proper monitoring of their hotels for signs of dangerous conditions including, but not limited to, human trafficking, sexual exploitation, rape, and kidnapping, by ignoring the following conditions:

i.      The repeated refusal of maid service;

ii.     The repeated, almost exclusive, use of side or rear exits for ingress and egress.

iii.     The number and frequency of visitors entering and exiting the hotel and/or property;

iv.     Guests present in any particular room in excess of the rooms capacity;

v.     Signs of the repeated verbal abuse, physical abuse, restraint and/or confinement of an individual by another;

vi.     Signs of control over an individual and/or an individual's personal property by another, including, but not limited to, identification documents;

vii.     Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire; and

viii.     The repeated renting of specific rooms in the hotel and/or presence on the property.

n.     Failure to adequately train, supervise, and retain employees, to ensure proper monitoring of their hotels for signs of suspicious behavior on the premises, which would have alerted the Defendants to the sex trafficking of J.F., or other criminal activity to which she was a victim, including, but not limited to sounds of distress coming from rooms and areas in the hotel and/or on the property, non-guests entering and exiting rooms in the hotel and/or on the property, the repeated renting of specific rooms in the hotel and/or presence on the property, and the apparent purchasing of sex acts in the hotel and/or on the property;

o.     Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure the investigation of suspicious behavior at their hotel and/or properties which would have alerted the Defendants to the sex trafficking of J.F. and/or other criminal activity to which she was a victim;

p.     Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure proper reporting to law

enforcement of signs of criminal activity at their hotels and/or on their properties, including, but not limited to human trafficking and sexual exploitation;

q.      Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants, contractors and/or employees, including, but not limited to, training to ensure a timely response and investigation into guest complaints regarding suspicious behavior at their hotels and/or on their properties, which would have resulted in their discovery of the sex trafficking of J.F. and/or other criminal activity to which she was a victim; and

r.      Being otherwise careless and negligent.

**ANSWER:  To the extent the allegations in Paragraph 103 relate to HII, HII denies the allegations and calls for strict proof thereof.**

104.    As a direct and proximate result of the aforementioned negligent acts, omissions, and/or commissions by the Defendants, J.F. was kidnapped, repeatedly and consistently assaulted both physically and sexually, verbally abused, held against her will, regularly exploited, and was otherwise irreparably injured, both physically and psychologically. Said acts were repeatedly perpetrated at the Defendants' hotels and properties and the Defendants failed to prevent against such criminal activity. The imminent harm described above, as well as J.F.'s injuries, were a foreseeable and preventable result of the Defendants' negligence and their failure to adequately train and supervise their servants, contractors, employees and/or agents.

**ANSWER:  To the extent the allegations in Paragraph 104 relate to HII, HII denies the allegations and calls for strict proof thereof.**

105.    J.F. has suffered, and/or will continue to suffer, from injuries, including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss, past, present and future, as a direct and proximate result of the Defendants' failure to adequately train, supervise, and retain their employees to adequately recognize and investigate indicia of criminal activity. The Defendants' failure to adequately train, supervise, and retain their employees, agents, and/or contractors facilitated such an environment of disorder and violence that the injuries sustained by J.F. were both foreseeable and imminent.

**ANSWER:  To the extent the allegations in Paragraph 105 relate to HII, HII denies the allegations and calls for strict proof thereof.**


106.    Additionally, J.F. has suffered, and continues to suffer, from damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and/or medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendants', and/or their actual and/or apparent agents, servants, contractors and/or employees', negligent acts, omissions, and/or commissions.

**ANSWER:  To the extent the allegations in Paragraph 106 relate to HII, HII denies the allegations and calls for strict proof thereof.**


107.    Furthermore, J.F. has suffered, and continues to suffer, from injuries, including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectations.

**ANSWER:  To the extent the allegations in Paragraph 107 relate to HII, HII denies the allegations and calls for strict proof thereof.**

108.    The Plaintiff avers that all damages, past, present, and future, were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendants and/or their actual and/or apparent agents, servants, contractors and/or employees', without any negligence or want of due care on the part of the Plaintiff contributing thereto.

**ANSWER:  To the extent the allegations in Paragraph 108 relate to HII, HII denies the allegations and calls for strict proof thereof.**

### D.    COUNT FOUR – Unjust Enrichment

109.    The Plaintiff J.F. incorporates each foregoing allegations.

**ANSWER:  HII incorporates its answers to the foregoing paragraphs.**

110.    As a result of the trafficking and sexual exploitation of J.F., the Defendants unjustly financially benefitted, and enriched themselves at J.F.'s expense by their acts, omissions, and commissions including, but not limited to:

a.    Profit from renting rooms to those looking to sexually exploit J.F.

b.    Increased profit margins due to lower operation costs by refusing to implement proper training of Defendants' employees and managers regarding the identification of human trafficking and sexual exploitation;

c.    Increased profit margins due to lower operation costs by refusing to install proper security devices in the lobby, hallways, and parking lots of the Defendants' hotels and properties that would help (a) deter human trafficking and sexual exploitation and (b) be used to identify the

occurrence of human trafficking and sexual exploitation and alert the proper authorities and/or intervene in an appropriate way;

d.      Increased profit margins due to lower operation costs by refusing to install adequate lighting and security cameras to monitor ingress and egress of human traffickers and visitors looking to purchase sex at the Defendants' hotels and properties.

e.      Increased profit margins due to lower operation costs by refusing to hire qualified security officers who would actively combat human trafficking and sexual exploitation.

f.      Increased profit margins due to lower operation costs by refusing to implement proper security measures to prevent and identify human trafficking and sexual exploitation at the Defendants' hotels and property.

g.      Increased profit margins as a result of the continued customer loyalty of traffickers and buyers of commercial sex who sought to exploit individuals, like J.F., due to the Defendants' lack of measures against sexual exploitation and human trafficking. This customer loyalty lead to continued alcohol, food, and room sales.

h.      Benefit of avoiding interference by law enforcement officials and spending the time to address and properly solve any incidence or pattern of human trafficking or sexual exploitation at the Defendants' hotel or property. This prevented the Defendants from having to spend the time and money to fill out all proper and necessary law enforcement reports and information, respond to proper and necessary subpoena requests, and cooperate with any inquiry and needs of the prosecution.

i.      Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking

and sexual exploitation or take active security measures to prevent human trafficking or sexual exploitation on their property.

**ANSWER:  To the extent the allegations in Paragraph 110 relate to HII, HII denies the allegations and calls for strict proof thereof.**

111.    These benefits were conferred onto the Defendants with their knowledge of the trafficking and/or sexual exploitation of J.F. and others like her. The Defendants accepted and retained these benefits under circumstances that make it inequitable for them to retain them without paying their value.

**ANSWER:  To the extent the allegations in Paragraph 111 relate to HII, HII denies the allegations and calls for strict proof thereof.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

1.    The Complaint and each cause of action alleged therein fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

2.    The Complaint is barred in whole or in part because the incidents alleged, and all damages complained of, if any, were caused by the superseding and/or intervening acts of parties over whom HII had no control or right of control.

### Third Affirmative Defense

3.      The Complaint is barred in whole or in part because the statute sued upon is unconstitutionally vague and ambiguous.

## Fourth Affirmative Defense

4.      The Complaint is barred in whole or in part because Plaintiff failed to take reasonable steps to mitigate her alleged damages.

## Fifth Affirmative Defense

5.      The Complaint is barred in whole or in part by applicable statutes of limitations.

## Sixth Affirmative Defense

6.      The Complaint is barred in whole or in part because the alleged acts or omissions, if any, were not committed by agents or employees of HII or, alternatively, were not committed within the scope of employment or authority conferred by HII nor subsequently ratified by HII.

## Seventh Affirmative Defense

7.      HII denies that it is indebted or liable to the Plaintiff in any amount for any reason.  HII further denies that Plaintiff has suffered the injuries or damages alleged and HII calls for strict proof thereof.

## Eighth Affirmative Defense

8.      HII reserves the right to assert all applicable affirmative defenses, including but not limited to: the statute of limitations, assumption of the risk, contributory negligence, and/or failure to mitigate damages to the extent such defenses may be supported by further investigation, discovery, and/or evidence at the trial of this matter.

WHEREFORE, Defendant Hospitality International, Inc., by counsel, respectfully requests that this Honorable Court dismiss Plaintiff's Complaint with prejudice and grant it any other such relief the Court deems just and proper.

Dated: March 6, 2020

Respectfully Submitted,

By:  _____ _/s/_____
                        Counsel

C. Dewayne Lonas, Esquire (VSB #44298)
Taylor D. Brewer, Esquire (VSB #82041)
**Moran Reeves & Conn PC**
1211 E. Cary Street
Richmond, Virginia 23219
Telephone: (804) 864-6250
Facsimile: (804) 421-6251
dlonas@moranreevesconn.com
tbrewer@moranreevesconn.com
*Counsel for Defendant Hospitality International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of March, 2020, I electronically filed the foregoing pleading using the CM/ECF System and I hereby certify a copy of the foregoing was sent to the following CM/ECF participants:

Michael G. Phelan, Esq. (VSB #29725)
Brielle M. Hunt, Esquire (VSB #29725)
Phelan Petty, PLC
6641 West Broad Street, Suite 406
Richmond, VA 23230
Telephone: (804) 980-7100
Facsimile: (804) 767-4601
mphelan@phelanpetty.com
bhunt@phelanpetty.com
*Counsel for Plaintiff*

Mary E. Gately, Esq. (VSB #28845)
DLA Piper LLP (US)
500 8th Street, NW
Washington, DC  20004
Telephone: (202) 799-4507
Facsimile: (202) 799-5507
Mary.gately@dlapiper.com
*Co-Counsel for G6 Hospitality, LLC*

Angela C. Agrusa, Esq.
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA  90067
Telephone: (310) 595-3000
(*Pro Hac Vice* pending)
*Co-Counsel for G6 Hospitality, LLC*

By: _____/s/_____
        C. Dewayne Lonas, Esquire (VSB #44298)
        Taylor D. Brewer, Esquire (VSB #82041)
        **Moran Reeves & Conn PC**
        1211 E. Cary Street
        Richmond, Virginia 23219
        Telephone: (804) 864-6250
        Facsimile: (804) 421-6251
        dlonas@moranreevesconn.com
        tbrewer@moranreevesconn.com
        *Counsel for Defendant Hospitality International, Inc.*